UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

| | |
|---|---|
| SHANNA M. GLYNN, | Case No. 2:24-cv-19 |
| Plaintiff, | Hon. Robert J. Jonker |
| | U.S. District Judge |
| v. | |
| MARQUETTE CITY POLICE DEPARTMENT and STATE OF MICHIGAN, | |
| Defendants. | |
| _____/ | |

**REPORT AND RECOMMENDATION**

I. **Introduction**

This Report and Recommendation (R. & R.) addresses the motions to dismiss filed by Defendant State of Michigan (ECF No. 6) and Defendant Marquette City Police Department (ECF No. 9).

Plaintiff — Shanna M. Glynn — filed suit pursuant to 42 U.S.C. § 1983 on February 6, 2024. In her complaint, Glynn asserts that the Marquette City Police Department (MCPD) and the State of Michigan deprived her of equal protection in violation of the Fourteenth Amendment and due process of law in violation of the Fifth Amendment. (ECF No. 1, PageID.2-3.) She further alleges that MCPD officers violated various state laws. (*Id.*, PageID.3-4.)

More specifically, Glynn alleges that after she was drugged, stalked, and assaulted on September 15, 2022, MCPD officers picked her up for a well-being check.

(*Id.*, PageID.5.) She says that she was missing all of her possessions, and that she had no recollection of what had happened to her, but she had sustained numerous injuries. Despite her injuries, the MCPD officers did not provide Glynn with a medical examination. (*Id.*, PageID.6.) Instead, they dropped her off at a friend's car and left her there without her possessions. Over the next several months, Glynn made numerous attempts to report the details of the incident to the MCPD, and to learn more about the investigation into the men who stalked and assaulted her. (Id., PageID.6-10.) But Glynn says that MCPD officers failed to properly preserve evidence, insufficiently investigated the alleged perpetrators, wrote false statements about Glynn in their police reports, and chastised Glynn for "emotionally affect[ing]" the alleged perpetrators. As for the State of Michigan, Glynn alleges that it "refused to investigate the crimes committed against [her] by [MCPD]." (*Id.*, PageID.2, 13-14.)

Defendants now move to dismiss, asserting that Glynn's complaint fails to state a claim to relief that is plausible on its face. (ECF Nos. 6, 9.) Specifically, the State of Michigan argues that it is entitled to sovereign immunity, that it is not a person for the purposes of § 1983, and that Glynn has no constitutional right to a criminal investigation. (ECF No. 7, PageID.35-39.) MCPD argues that it is not a legal entity capable of being sued, and that even assuming that Glynn intended to sue the City of Marquette, Glynn cannot sue the City under a theory of respondeat superior. (ECF No. 10, PageID.56-58.)

Glynn responds by arguing that her complaint, which sets forth allegations of criminal activity and seeks injunctive rather than monetary relief, lies outside of the scope of Eleventh Amendment sovereign immunity. (ECF No. 11, PageID.84-85.) She then seems to posit that the Court should disregard any case law establishing that an individual has no right to a criminal investigation or prosecution. (*Id.*) Glynn further argues that the State of Michigan, as her local government, is a person under § 1983. (*Id.*, PageID.85.) Glynn does not address any of the legal arguments advanced in MCPD's motion to dismiss, but rather asserts that MCPD's police report is evidence of its criminal activity and clarifies that an individual referred to as her friend is not, in fact, a friend. (*Id.*, PageID.87-88.)

The undersigned respectfully recommends that the Court grant Defendants' motions to dismiss (ECF Nos. 6, 9) because Glynn's complaint fails to state a claim upon which relief may be granted even when it is liberally construed. The undersigned further recommends that the Court decline to exercise supplemental jurisdiction over Glynn's state law claims.

## II.   Relevant[1] Factual Allegations

Glynn says that she was picked up by MCPD officers on September 15, 2022, at approximately 11:55 P.M. (ECF No. 1, PageID.5.) She says that the officers who picked her up were responding to a well-being check requested by an unknown person. At the time, Glynn says that she had been separated from her companion for the night, that her possessions had been stolen, and that she had no recollection of either the separation or the theft. (*Id.*) Glynn says that before being picked up by the police, she had sustained numerous injuries including "three severe concussions" to the back of her head,[2] multiple lacerations on her ankle, feet, and between her toes, a dislocated toe, and fingerprint bruises beginning below her knees and ending above her waist. Glynn further alleges that she had been drugged into unconsciousness by an unknown substance. (*Id.*)

Glynn alleges that she spent approximately two hours in MCPD custody, looking for her companion and her possessions. (*Id.*, PageID.6.) Despite her obvious injuries, Glynn says that she was never given a medical examination. Instead, she says that the officers became irritated that they could not locate her companion, so

---

[1]   Glynn's complaint contains several allegations that seem to have no specific connection with her claims against Defendants. For example, Glynn alleges that: "Every year, too many young women perish mysteriously into the water or wilderness. Big corporations are buying out our entire city, and with them has come a new 'hospitality' industry." (ECF No. 1, PageID.11.) Later, she alleges that "[a]t the time of this incident, [she] had already spent ~3 months dealing with Ludig Mining Corp." which had "stole[n] [her] family's property for their Class-A Road, without compensation, permission, or due process." (*Id.*, PageID.15.)

[2]   Presumably, Glynn intended to say three severe *contusions* to the back of her head.

4

they dropped her off at her companion's car and left her there "in a state of panic and confusion, without [her] driver's license, and without [her] prescription glasses." (*Id.*)

But before the officers dropped her off, Glynn says that she began to remember more about the night. According to Glynn, she told the officers that three men had stalked her and her companion from the Delft Bistro to the Landmark Inn. (*Id.*) The men bought Glynn and her companions drinks and continued to try to buy Glynn drinks even after a bartender had cut her off due to her "severely drugged state." Glynn says that she was able to provide the officers with one of the men's names. (*Id.*)

After the officers dropped Glynn off on September 15, 2022, she says that she "ran through the dark for nearly a mile" before locating her car. She then drove home while speaking to her husband on the phone. (*Id.*) Glynn says that her husband took the following day off of work in order to take Glynn to MCPD to file a report. Glynn says that she reported her injuries to MCPD officers, but the officers did not take any photographs at the time. (*Id.*) Afterwards, Glynn went to a walk-in clinic, where doctors referred her to the emergency room. The emergency room doctor documented all of Glynn's injuries and informed her that the bruises on her body were the result of "abusive handling." (*Id.*) When Glynn took that doctor's medical report to MCPD officers, the officers asked to take their own photographs, and forwarded her report to Detective Doug Heslip. (*Id.*, PageID.6-7.)

On September 20, 2022, Glynn says that she went in for an interview with Detective Heslip. (*Id.*, PageID.7.) She reported that she had used social media to

identify one of the men that had bought her a drink. She further informed Heslip that she and her husband were monogamous, and of the Christian Faith, and she therefore would not have consented to any sexual contact with another person. (*Id.*) Glynn says that she also showed Detective Heslip a video taken by her companion on the night of September 15, 2022, wherein Glynn is walking down the sidewalk crying and stating: "I don't want to be used sexually or anything sexual, I am all done, all done, I am just done done done." (*Id.*) Although Detective Heslip told Glynn that he had saved the video, she later learned that he had not. In fact, Detective Heslip had not accurately recorded any part of their conversation. (*Id.*)

Glynn says that she informed Detective Heslip that she did not believe that she had been sexually penetrated, but that she believed that was the intent of her attacker. Glynn told Heslip that she believed she used the back of her head to defend against the attacker, which presumably led to her head injuries. (*Id.*) She asked Heslip to interview the three men from the night of September 15, 2022, and to check for any injuries to their face, head, or hands. Instead of reflecting Glynn's statements, Glynn says that Detective Heslip's report indicated that she did not believe she was sexually assaulted. (*Id.*) The report further indicated that Glynn's husband had conducted a visual and physical examination of her vagina, which Glynn says was both untrue and deeply traumatizing.

According to Glynn, Detective Heslip later called her and informed her that he had interviewed all three men as requested, and that their alibis checked out and none of them had injuries. (*Id.*) But he then informed Glynn that one of the men had

6

left the State before MCPD could interview him in person or take any photographs of him. (*Id.*, PageID.8.) When Glynn asked whether the man who left the State could be polygraphed, Heslip told her that the man had been polygraphed, and everything checked out. Detective Heslip then accused Glynn of emotionally damaging the men. (*Id.*)

Glynn says that Heslip withheld his report from her. Glynn was therefore unable to review the report until she received her case file seven months after the incident occurred, and after the case had already been closed. (*Id.*) Upon reviewing the file, Glynn says that she learned that one of the three men from the night of September 15, 2022, did have a head injury when he was interviewed, which he claimed was the result of a fall while leaving the bar. Glynn says that this was the same man who left the State following the incident, and whom Heslip claimed to have polygraphed. (*Id.*) But Glynn additionally learned that the man had refused a polygraph based on Detective Heslip's advice.

After Glynn reviewed the file, she says that her husband visited MCPD Chief Grimm to review the report. Chief Grimm ultimately reopened the case and handed it over to a new detective: Detective Aldrich. (*Id.*, PageID.8-9.) Glynn says that she met with Detective Aldrich on April 13, 2023. (*Id.*, PageID.9.) She alleges that Aldrich made some attempts to locate evidence and interview witnesses, but that he did so with little success.

Glynn says that she set up an additional interview with Detective Aldrich in the hopes of retrieving the possessions she had given to Detective Heslip as evidence.

7

(*Id.*)  Those possessions included a sweater that Glynn believes was "spattered" with the assailant's blood, and a pair of sandals that had "pieces of a man's zipper-fly embedded in them."  But Glynn says that MCPD officers informed her that her sweater and sandals were found in Detective Heslip's desk after his retirement.  (*Id.*)  Because they were unlabeled, they had been thrown away.

On May 25, 2023, Glynn says that she again spoke with Chief Grimm regarding her case.  (*Id.*)  Glynn informed Chief Grimm that she had been traumatized by MCPD officers, and that he should hire a female detective to handle cases of sexual assault.  According to Glynn, Chief Grimm "profusely apologized for the lack of care, and for the unprofessional behavior of his officers and their abusive actions against [Glynn]."  (*Id.*)  Later, when Glynn tried contacting Chief Grimm again, he allegedly informed her that he could not "have contact with [Glynn] because his attorney [would] not let him."  (*Id.*)

Glynn says that the State of Michigan has "refused to investigate" MCPD's crimes against her.  (*Id.*, PageID.3.)  More specifically, Glynn says that she submitted a written complaint against MCPD to the Michigan State Police, but they told her they "could not investigate because the Michigan A.G. did not mandate it."  (*Id.*, PageID.14.)

### III.   Dismissal

The Federal Rules provide that a claim may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true,

to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In determining whether a claim has facial plausibility, a court must construe the complaint in the light most favorable to the plaintiff, accept the factual allegations as true, and draw all reasonable inferences in favor of the plaintiff. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). "When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion so long as they are referred to in the Complaint and are central to the claims contained therein." *Id.*

Pro se complaints "are held to less stringent standards than formal pleadings drafted by lawyers in the sense that a pro se complaint will be liberally construed in determining whether it fails to state a claim upon which relief could be granted." *Jourdan v. Jabe*, 951 F.2d 108, 110 (6th Cir. 1991) (first citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); and then citing *Haines v. Kerner*, 404 U.S. 519, 520 (1972)).

### a. State of Michigan's Motion to Dismiss (ECF No. 6)

As set forth above, the State of Michigan moves to dismiss Glynn's complaint on three separate grounds: (1) it is entitled sovereign immunity, (2) it is not a person for the purposes of 42 U.S.C. § 1983, and (3) Glynn has no constitutional right to a criminal investigation. (ECF No. 7, PageID.35-39.) In response, Glynn avers that: (1) the State of Michigan is not entitled to sovereign immunity as to her claims for injunctive relief, (2) the State of Michigan is one of her local governments, and may

9

therefore be sued under § 1983, and (3) the Court should not adhere to any precedent establishing that she has no constitutional right to an investigation under the circumstances presented.  (ECF No. 11, PageID.84-85.)

Turning first to the issue of sovereign immunity, Glynn's prayer for relief reads as follows:

> I humbly request that this Court protects the girls and women of my community, and compensates me for the extreme physical, emotional, and financial damage caused by being victimized by the Police when they found me as a concussed drugged victim; then chose to abandoned [sic] me, and abuse me afterward.
>
> Federal protection of the women in my community is paramount, because no State authority exists to audit illegal actions committed by our local police; I have pursued every reasonable avenue without being taken seriously.  Every year too many young women perish mysteriously into the water or wilderness.  Big corporations are buying out our entire city, and with them has come a new "hospitality" industry.
>
> I humbly request a full FBI audit of every one of the MCPD, and MSP (Negaunee Post), cases which involve female victims of possible CSC or death, from (~2005-present). If investigation determines that any woman has been denied the protection of any law, or Due Process, the State of Michigan will be liable to resolve all their debts, issue written apology, and set them free to succeed upon their own merits, pursuant to the State's gross negligence. My State should start building hedge-funds and multi-national corporations for their scientifically proven community damage.
>
> I will be personally compensated by the MCPD for all my time, and the time of my family.  In simplicity, they owe me one million dollars.  If I am required to submit an hourly rate of involuntary and unlawful suffering, it equals MCPD's total budget/number of MCPD Commanding Officers/2080, per hour.  I will submit the best approximation of a labor journal I can, under the circumstances, and if required.

(ECF No. 1, PageID.12.)

States enjoy sovereign immunity from suits brought in federal court unless: (1) the State has consented to suit, (2) Congress has properly abrogated the State's immunity, or (3) the suit seeks prospective injunctive or declaratory relief requiring a state official to comply with federal law. *S & M Brands, Inc.* v. Cooper, 527 F.3d 500, 507 (6th Cir. 2008) (citing *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 817 (6th Cir.2000)). The second aforementioned exception was first set forth in *Ex parte Young*, 209 U.S. 123 (1908). Glynn asserts that her requests for injunctive relief against the State fall within the purview of *Ex parte Young*. The undersigned disagrees.

As an initial matter, the exception set forth in *Ex parte Young* applies when a plaintiff seeks injunctive or declaratory relief *against a state official*. To the extent that Glynn's complaint seeks injunctive relief, it seeks that relief against the State of Michigan itself. "The *Young* doctrine rests on the premise that a suit against a state official to enjoin an ongoing violation of federal law is not a suit against the State." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring); *Keweenaw Bay Indian Cmty. v. Khouri*, 621 F. Supp. 3d 828, 832 (W.D. Mich. 2022) ("The holding in *Ex parte Young rests* on a legal fiction . . . Although the lawsuit is brought against a state official in his or her capacity, the lawsuit is not a claim against the state itself." (citations omitted)).

As a secondary matter, the exception set forth in *Ex parte Young* applies when a plaintiff seeks *prospective* injunctive or declaratory relief. *Doe v. Wigginton*, 21 F.3d 733, 737-37 (6th Cir. 1994) (citing *Ex parte Young*, 209 U.S. at 159-60) (explaining

11

that an official-capacity claim for retroactive relief is deemed to be against the State, while an official-capacity claim for prospective relief is not). To the extent that Glynn's complaint seeks injunctive relief, it is not prospective; Glynn requests a federal investigation into Michigan State Police cases dating back to 2005. *See id.* ("Retroactive relief compensates the plaintiff for a past violation . . . . In contrast, prospective relief merely compels the state officers' compliance with federal law in the future.")

Because it is the undersigned's opinion that Glynn's claims against the State of Michigan do not fall within an exception to Eleventh Amendment sovereign immunity, the undersigned need not address the State's alternative arguments. Nevertheless, the undersigned notes that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). And the Supreme Court's decision in *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), does not provide otherwise. There, the Supreme Court specifically limited its holding to "local government units which are not considered part of the State for Eleventh Amendment purposes." *Id.* at 690 n. 54. Furthermore, the State is correct in observing that "a private citizen lacks a judicially cognizable interest in the prosecution or non-prosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). As such, it is the undersigned's opinion that Glynn's allegation that the State of Michigan failed to investigate the conduct of MCPD or its officers fails to state a claim upon which relief may be granted.

### b. MCPD's Motion to Dismiss (ECF No. 9)

MCPD also moves to dismiss Glynn's claims against it. As set forth above, MCPD contends that it is not a legal entity capable of being sued, and that even assuming that Glynn intended to sue the City of Marquette, Glynn cannot sue the City under a theory of respondeat superior. (ECF No. 10, PageID.56-58.)

As an initial matter, the undersigned agrees that MCPD is not a separate legal entity capable of being sued under § 1983. *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) ("[T]he Police Department is not an entity which may be sued . . . ."); *May-Shaw v. City of Grand Rapids*, No. 1:19-CV-117, 2019 WL 2265076, at *3 (W.D. Mich. May 28, 2019) ("It is well settled in Michigan that a police department is not a legal entity capable of being sued in a 42 U.S.C. § 1983 action." (citation omitted)). However, the City of Marquette, which governs MCPD, is a legal entity capable of being sued. And unlike the State of Michigan, the City of Marquette is a "person" under § 1983. *Monell*, 436 U.S. at 690. The undersigned therefore construes Glynn's complaint as asserting claims against the City of Marquette. *See LaPlante v. Lovelace*, No. 2:13-CV-32, 2013 WL 5572908, at *2 (W.D. Mich. Oct. 9, 2013) (construing the plaintiff's complaint as asserting claims against Marquette County as the governing body of the Marquette County Sheriff's Department).

Although the City of Marquette is a "person" under § 1983, it "cannot be held liable under § 1983 on a respondeat superior theory." *Monell*, 436 U.S. at 691. "[I]n other words, a municipality cannot be held liable *solely* because it employs a tortfeasor . . . ." *Id.* (emphasis in original). Instead, Glynn must show that a policy

or custom of the City of Marquette acted as the "moving force" behind a violation of her constitutional rights. *Turner v. City of Taylor*, 412 F.3d 629, 639 (6th Cir. 2005); *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003); *Doe v. Claiborne Cnty.*, 103 F.3d 495, 508-09 (6th Cir. 1996). The first inquiry in evaluating such a claim is whether the municipality had a policy or custom. *Doe*, 103 F.3d at 509. "To show the existence of a municipal policy or custom leading to the alleged violation, a plaintiff can identify: (1) the municipality's legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal violations." *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).

In the undersigned's opinion, Glynn does not plausibly allege that a custom or policy of the City of Marquette acted as the moving force behind a violation of her constitutional rights. Instead, Glynn alleges that individual employees of the City — primarily Detective Heslip — mishandled the investigation into the September 15, 2022, incident in a manner that was traumatic for Glynn. This is further underscored by Glynn's request for an audit of MCPD cases involving female victims of criminal sexual conduct. This request reflects that Glynn at most speculates without personal knowledge or factual support that MCPD has a policy or custom of mishandling cases involving sexual assault.

## IV. State Law Claims

As mentioned above, Glynn asserts various state law claims in addition to her federal claims. In determining whether to retain supplemental jurisdiction over state law claims, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993). Ordinarily, when a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state-law claims. *Id.* Dismissal, however, remains "purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)); *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012).

If the Court adopts the undersigned's recommendation, it will dismiss all of Glynn's federal claims. The balance of the relevant considerations would therefore weigh against the exercise of supplemental jurisdiction. As such, the undersigned respectfully recommends that the Court decline to exercise supplemental jurisdiction.

## V. Recommendation

The undersigned is sympathetic to the traumatic experiences that Glynn says she endured on and after September 15, 2022. Nevertheless, the undersigned respectfully recommends that the Court grant Defendants' motions to dismiss (ECF Nos. 6, 9) because Glynn's complaint fails to state a claim on which relief may be granted even when it is liberally construed. The undersigned further recommends

that the Court decline to exercise supplemental jurisdiction over Glynn's state law claims.

If the Court accepts this recommendation, this case will be dismissed.


Dated:  April 19, 2024                                          /s/ *Maarten Vermaat*
                                                                MAARTEN VERMAAT
                                                                U. S. MAGISTRATE JUDGE

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).